# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RYAN ROE; RACHEL ROE;
SEXUALITY AND GENDER
ALLIANCE, an association,

*Plaintiffs-Appellants*,

v.

DEBBIE CRITCHFIELD, in her
official capacity as Idaho State
Superintendent of Public Instruction;
LINDA CLARK, in their official
capacities as members of the Idaho
State Board of Education; WILLIAM
G. GILBERT, Jr., in their official
capacities as members of the Idaho
State Board of Education; DAVID
HILL, in their official capacities as
members of the Idaho State Board of
Education; SHAWN KEOUGH, in
their official capacities as members of
the Idaho State Board of Education;
KURT LIEBICH, in their official
capacities as members of the Idaho
State Board of Education; CALLY J.
ROACH, in their official capacities as
members of the Idaho State Board of
Education; CINDY SIDDOWAY, in

No. 23-2807

D.C. No.
1:23-cv-00315-
DCN

ORDER AND
AMENDED
OPINION

their official capacities as members of the Idaho State Board of Education; IDAHO STATE BOARD OF EDUCATION; INDEPENDENT SCHOOL DISTRICT OF BOISE CITY #1; DAVE WAGERS, in their official capacities as members of the Independent School District of Boise City #1 Board of Trustees; MARIA GREELEY, in their official capacities as members of the Independent School District of Boise City #1 Board of Trustees; NANCY GREGORY, in their official capacities as members of the Independent School District of Boise City #1 Board of Trustees; ELIZABETH LANGLEY, in their official capacities as members of the Independent School District of Boise City #1 Board of Trustees; BETH OPPENHEIMER, in their official capacities as members of the Independent School District of Boise City #1 Board of Trustees; SHIVA RAJBHANDARI, in their official capacities as members of the Independent School District of Boise City #1 Board of Trustees; COBY DENNIS, in his official capacity as Superintendent of the Independent School District of Boise City #1,

*Defendants-Appellees*.

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted May 9, 2024
Pasadena, California

Filed March 20, 2025
Amended May 23, 2025

Before:  Kim McLane Wardlaw, Morgan Christen, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Preliminary Injunction

The panel affirmed the district court's order denying a preliminary injunction in an action brought by Rebecca Roe, a transgender student in Idaho public school, and Sexuality and Gender Alliance (SAGA), a student organization at Boise High School, challenging Idaho Senate Bill 1100 (S.B. 1100), which requires all public-school students in Idaho to use only the restroom and changing facility corresponding to their "biological sex."

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's determination that SAGA was unlikely to succeed on the merits of its equal protection claim in its facial challenge to S.B. 1100. Applying intermediate scrutiny, the panel held that the State identified an important governmental objective—protecting bodily privacy—and that the State chose permissible means to achieve that objective. To prevail on its facial challenge to S.B. 1100, SAGA must show that S.B. 1100's mandated sex-segregation of all covered facilities is unconstitutional; its equal protection claim fails if S.B. 1100's application to any of the covered facilities survived intermediate scrutiny. The privacy interest in avoiding bodily exposure is most strongly implicated in locker rooms and communal shower rooms that lack curtains or stalls. At this stage in the litigation, the panel saw no argument that S.B. 1100's mandatory segregation of these facilities on the basis of "biological sex" is not substantially related to the State's interests in: (1) not exposing students to the unclothed bodies of students of the opposite sex; and (2) protecting students from having to expose their own unclothed bodies to students of the opposite sex.

The panel affirmed the district court's determination that SAGA was unlikely to succeed on the merits of its claim that S.B. 1100 violates Title IX of the Public Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq*., because it impermissibly discriminates by requiring transgender students to use facilities that do not align with their gender identity. SAGA failed to meet its burden to show that the State had clear notice at the time it accepted federal funding that Title IX prohibited segregated access to the facilities covered by S.B. 1100 on the basis of transgender status.

Finally, the panel affirmed the district court's determination that SAGA was unlikely to succeed on the

merits of its claim that S.B. 1100 violates the right to informational privacy by excluding transgender students from facilities matching their gender identity. S.B. 1100 requires schools to provide an accommodation to a student who for any reason is unwilling or unable to use a multi-occupancy restroom or changing facility designated for the person's sex. Because the statute does not limit the use of single-occupancy facilities to only transgender students, the panel could not say on the existing record that observing a student accessing such a facility would necessarily disclose that student's transgender status.

## COUNSEL

Peter C. Renn (argued), Kell L. Olson, Tara L. Borelli, and Pelecanos, Lambda Legal Defense and Education Fund Inc., Los Angeles, California; Samuel L. Linnet, Alturas Law Group PLLC, Hailey, Idaho; J. Max Rosen, Munger Tolles & Olson LLP, San Francisco, California; Katherine M. Forster, Robyn K. Bacon, Nicholas R. Sidney, Paul Martin, Avery P. Hitchcock, and Jimmy P. Biblarz, Munger Tolles & Olson LLP, Los Angeles, California; for Plaintiffs-Appellants.

Erin M. Hawley (argued), Lincoln D. Wilson, John J. Bursch, and Henry W. Frampton IV, Alliance Defending Freedom, Washington, D.C.; Jonathan A. Scruggs, Alliance Defending Freedom, Scottsdale, Arizona; James E. M. Craig, Division Chief; Joshua N. Turner, Acting Solicitor General; James E. Rice Deputy Attorney General; Brian V. Church, Deputy Attorney General; Alan M. Hurst, Solicitor General; Raul R. Labrador, Attorney General; Office of the

Idaho Attorney General, Boise, Idaho; for Defendants-Appellees.

Mark S. Grube, Senior Assistant Solicitor General of Counsel; Judith N. Vale, Deputy Solicitor General; Barbara D. Underwood, Solicitor General; Letitia James, New York Attorney General; Office of the New York Attorney General, New York, New York; Neal Luna, Lane Polozola, and Colleen M. Melody, Assistant Attorneys General; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Anne E. Lopez, Hawai'i Attorney General, Office of the Hawai'i Attorney General, Honolulu, Hawai'i; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Commonwealth of Massachusetts Attorney General, Office of the Commonwealth of Massachusetts Attorney General, Boston, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada;

Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Joshua H. Stein, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Michelle A. Henry, Commonwealth of Pennsylvania Attorney General, Office of the Commonwealth of Pennsylvania Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Brian L. Schwalb, District of the Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; for Amici Curiae States of New York, Washington, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, and Vermont, and the District of Columbia.

Maureen P. Alger, Cooley LLP, Palo Alto, California; Audrey J. Mott-Smith and Emily J. Born, Cooley LLP, San Francisco, California; Shannon Minter, National Center for Lesbian Rights, San Francisco, California; Shawn Meerkamper, Transgender Law Center, Oakland, California; for Amici Curiae PFLAG, Inc., PFLAG Coeur D'Alene/Kootenai County (Idaho Chapter), PFLAG Moscow (Idaho Chapter), Trans Youth Equality Foundation, and Gender Diversity.

Illyana A. Green, Christina M. Isnardi, and Joshua J.W. Armstrong, Jenner & Block LLP, Washington, D.C.; Howard S. Suskin, Jenner & Block LLP, Chicago, Illinois;

Matthew D. Cipolla, Jenner & Block LLP, New York, New York; for Amici Curiae American Medical Association, American Academy of Pediatrics, American Psychiatric Association, and GLMA: Health Professionals Advancing LGBTQ+ Equality.

Donald A. Daugherty Jr. and Martha Astor, Defense of Freedom Institute, Washington, D.C., for Amicus Curiae Defense of Freedom Institute.

Katelyn E. Doering and Melinda R. Holmes, Deputy Attorneys General; James A. Barta, Solicitor General; Theodore E. Rokita, Indiana Attorney General; Office of the Indiana Attorney General, Indianapolis, Indiana; A. Barrett Bowdre, Principal Deputy Solicitor General; Edmund G. LaCour Jr., Solicitor General; Steve Marshall, Alabama Attorney General; Office of the Alabama Attorney General, Montgomery, Alabama; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas;

Ashley Moody, Florida Attorney General, Office of the Florida Attorney General, Tallahassee, Florida; Christopher M. Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Daniel Cameron, Commonwealth of Kentucky Attorney General, Office of the Commonwealth of Kentucky Attorney General, Frankfort, Kentucky; Jeff Landry, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General,

Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Kansas City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Drew H. Wrigley, North Dakota Attorney General, Office of the North Dakota Attorney General, Bismark, North Dakota; Gentner F. Drummond, Oklahoma Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Jonathan Skrmetti, Tennessee Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Jason Miyares, Virginia Attorney General, Office of the Virginia Attorney General, Richmond, Virginia; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; Bridget Hill, Wyoming Attorney General, Office of the Wyoming Attorney General, Cheyenne, Wyoming; for Amici Curiae Indiana, Alabama, and 22 Other States.

John A. Eidsmoe, Roy S. Moore, Talmadge Butts, and Katrinnah Darden, Foundation for Moral Law, Montgomery, Alabama, for Amicus Curiae Foundation for Moral Law.

Joseph A. Bingham and Daniel I. Morenoff, The American Civil Rights Project, Dallas, Texas, for Amicus Curiae The American Civil Rights Project.

**ORDER**

The opinion filed March 20, 2025, and appearing at 131 F.4th 975, is hereby amended as follows: On page 35, the sentence "Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686 unambiguously carves out *only* living facilities from Title IX's general mandate and not more intimate spaces such as restrooms, changing rooms, and communal showers." is deleted and replaced with "Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686's carve-out of living facilities from Title IX's general mandate is unambiguously limited to facilities such as dormitories."

With the foregoing amendment, the panel unanimously votes to deny the petition for partial panel rehearing. Plaintiff-Appellant's petition for partial panel rehearing, filed April 10, 2025, is **DENIED.**

# OPINION

CHRISTEN, Circuit Judge:

Before the summer of 2023, public school districts in Idaho were free to adopt their own policies regarding students' access to restrooms, locker rooms, and shower rooms. Approximately one quarter of Idaho's public schools had policies specifically permitting students to use the facilities corresponding to their gender identity. The Idaho Legislature altered that status quo by enacting Senate Bill 1100 (S.B. 1100), which now requires all public-school students in Idaho to use only the restroom and changing facility corresponding to their "biological sex."

Plaintiff Rebecca Roe, a transgender student in Idaho public school, and Plaintiff Sexuality and Gender Alliance, a student organization at Boise High School, filed a complaint in the district court that challenged S.B. 1100's mandatory sex-segregation of all covered facilities. They argued that the statute violates the Equal Protection Clause; Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*; and their Fourteenth Amendment right to informational privacy. They did not challenge the State's ability to maintain sex-segregated facilities or to exclude cisgender students from facilities designated for use by students of the opposite sex. They challenged only the statute's exclusion of transgender students from facilities corresponding to their gender identity. Plaintiffs moved to preliminarily enjoin S.B. 1100. The district court denied the motion, but our court granted Plaintiffs' emergency motion for an injunction pending appeal, and that emergency injunction remained in effect during the 2023-24 school year.

We now review the district court's order denying Plaintiffs' motion for a preliminary injunction. For the reasons stated below, we agree with the district court that Plaintiffs did not show that they are likely to succeed on the merits of their facial claims, and we affirm the district court's order.

## I.   BACKGROUND

On March 22, 2023, the Idaho Legislature adopted Idaho Senate Bill 1100, which went into effect on July 1, 2023.[1] S.B. 1100 requires that students in Idaho public schools use only the multi-occupancy restrooms and "changing facilities"—defined to include locker rooms, changing rooms, and shower rooms, Idaho Code Ann. § 33-6702(1)— designated for their "biological sex," *id.* §§ 33-6702, 73-114(2)(n), 33-6703.[2] The same restriction applies to overnight lodging during school-authorized activities. *See id.* § 33-6703(4). S.B. 1100 contains exemptions allowing, *inter alia*, coaching staff, maintenance workers, and persons

---

[1] The statute has now been codified as "Privacy and Safety of Students in Public Schools." Ch. 67, Title 33. Idaho Code Ann. §§ 33-6701 *et seq*. We refer to the statute as "S.B. 1100" for consistency with the district court's order and the parties' briefs.

[2] The statute defines "sex" as "biological sex, either male or female." Idaho Code Ann. §§ 33-6702, 73-114(2)(n). We have recognized that a person's "sex" is typically identified at birth based on an infant's external genitalia, though external genitalia "do not always align with other sex-related characteristics, which include internal reproductive organs, gender identity, chromosomes, and secondary sex characteristics." *Hecox v. Little*, 104 F.4th 1061, 1068 (9th Cir. 2024) (internal quotation marks omitted) *petition for cert. filed* (U.S. July 15, 2024) (No. 24-38). Where we use "biological sex" in this opinion, we do so because the statute adopts that term. We understand "biological sex" to be synonymous with "sex assigned at birth."

rendering medical assistance to enter changing facilities designated for the opposite sex, but there are no exceptions for transgender students.[3] *See id.* § 33-6704.

S.B. 1100 also requires that public schools provide a single-occupancy facility as a reasonable accommodation to a student who, for "any reason, is unwilling or unable to use a multi-occupancy restroom or changing facility designated for the person's sex and located within a public school building, or multi-occupancy sleeping quarters while attending a public school-sponsored activity." *See id.* § 33-6705. In order to access such a single-occupancy facility, the student must provide "a written request for reasonable accommodation to the public school." *See id.* § 33-6705(1)(b). This accommodation does not allow students to access covered facilities designated for use by students of the opposite sex while opposite-sex students could be present. *See id.* Finally, S.B. 1100 creates a civil cause of action for any student who encounters a student of the opposite sex in a covered facility. The statute entitles students to recover $5,000 from the public school for each such encounter. *See id.* § 33-6706.

Before S.B. 1100 was adopted, school districts in Idaho were free to regulate the use of locker rooms, changing rooms, and shower rooms as each deemed fit. Roughly 25% of school districts had policies that allowed students to use facilities consistent with their gender identities; the other

---

[3] The term "transgender" is an adjective for persons whose gender identity is not aligned with their sex recorded at birth; the term "cisgender" refers to persons whose gender identity aligns with their sex recorded at birth. *See* Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 N. Eng. J. Med. 2451, 2451 (2019).

75% of school districts did not have regulations one way or the other.

Rebecca Roe is a twelve-year-old transgender girl who has attended school within the Boise School District since kindergarten. Roe declared that she began her social transition in the fifth grade and that she desired to use the restroom and changing facilities consistent with her gender identity.[4] Roe alleged that excluding her from those facilities would jeopardize her social transition, imperil her mental and physical health, and "out" her to her peers as transgender when she entered a new school in seventh grade. Sexuality and Gender Alliance (SAGA) is a student organization that represents lesbian, gay, bisexual, transgender, and queer students at Boise High School. One of SAGA's members, A.J., is a transgender boy who alleged that he and other members of SAGA wished to use the facilities corresponding to their gender identity. A.J. asserts that excluding him and fellow SAGA members from those facilities would cause them to suffer irreparable injuries.

Defendant Debbie Critchfield is Superintendent of Public Instruction in Idaho. The other Defendants are the State Board of Education and its members, as well as the Boise School District, its superintendent, and board members. All are responsible for implementing and abiding by laws related to public education in Idaho.

---

[4] Social transition refers to "a process by which a child is acknowledged by others and has the opportunity to live publicly, either in all situations or in certain situations, in the gender identity they affirm and has no singular set of parameters or actions." E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S75 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.210064.

Plaintiffs challenged S.B. 1100 as facially unconstitutional. They alleged that the statute violates the Equal Protection Clause, Title IX, and the Fourteenth Amendment right to informational privacy. In conjunction with their complaint, Plaintiffs filed a motion for a preliminary injunction.

As the new school year approached, Plaintiffs filed a motion for a temporary restraining order, which Defendants opposed. The district court granted the request for a TRO to "maintain the landscape as it existed prior to S.B. 1100 pending a more complete review of the issues." *Roe ex rel. Roe v. Critchfield*, No. 1:23-CV-00315, 2023 WL 6690596, at *3 (D. Idaho Oct. 12, 2023). Thereafter, Defendants filed a response brief to the preliminary injunction motion and asked the court to dismiss all of Plaintiffs' claims.

After a hearing on the motion, the district court denied Plaintiffs' request for a preliminary injunction and also denied Defendants' motion to dismiss. *Id*. at *18. Regarding the denial of the preliminary injunction, the court concluded that Plaintiffs were unlikely to succeed on the merits of their claims. *Id.* at *17–18. It also found they had not established a likelihood of irreparable harm or that the balance of the equities weighed in favor of granting the injunction. *Id.* at *17.

Plaintiffs timely filed a notice of appeal and also filed a motion for an emergency injunction staying enforcement of S.B. 1100 pending appeal. A motions panel of our court

granted the emergency motion.  After appellate briefing was complete, we heard argument on the appeal.[5]

## II.    STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). A district court's decision regarding preliminary injunctive relief is subject to limited review.  *See Wildwest Inst. v. Bull*, 472 F.3d 587, 589 (9th Cir. 2006).  A district court's order denying an injunction should be reversed only if the court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.  *See FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1211–12 (9th Cir. 2019); *see also adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018) ("The legal issues underlying the injunction are reviewed de novo because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000))).  "A district court's factual finding is clearly erroneous 'if it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'"  *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (quoting *Arc of Cal. v. Douglas*, 757 F.3d 975, 984 (9th Cir. 2014)).

"Although we review [legislative] factfinding under a deferential standard, . . . [t]he Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake." *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007); *see also Latta v. Otter*, 771 F.3d 456,

---

[5] After oral argument, we received notice that the parties stipulated to Roe's voluntary dismissal pursuant to Federal Rule of Appellate Procedure 42(b)(1).  Dkt. 102.  We construe this as a motion to dismiss and grant it.

469 (9th Cir. 2014) ("Unsupported legislative conclusions as to whether particular policies will have societal effects . . . have not been afforded deference by the Court.").

## III.    DISCUSSION

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (per curiam)).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors, harm to the opposing party and weighing the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).   Likelihood of success on the merits "is the most important" *Winter* factor and "is a threshold inquiry." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).   In the absence of "serious questions going to the merits," *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011), the court need not consider the other factors. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

We analyze each of SAGA's three facial claims and agree with the district court that SAGA did not establish that it is likely to succeed on the merits of its claims as currently stated.

## A.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

It is well-settled that legislative classifications based on sex call for a heightened standard of review.  The Supreme Court has required that "a party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification."  *United States v. Virginia*, 518 U.S. 515, 524 (1996) (quoting *Miss. Univ. for Women*, 458 U.S. 718, 724 (1982)).  Accordingly, the State "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id*. at 533 (internal quotation marks and citation omitted and alterations accepted).  "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id.*  "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females."  *Id.*  Heightened, or intermediate, scrutiny is thus satisfied when a policy "has a close and substantial bearing on" the governmental objective in question.  *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70 (2001).   Under circuit precedent, the same framework applies to classifications based on transgender status.  *See Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024); *Hecox*, 104 F.4th at 1079; *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (per curiam).

The parties agree that intermediate scrutiny applies to our review of S.B. 1100. Both parties conclude that S.B. 1100 classifies based on sex and warrants intermediate scrutiny for that reason, but SAGA argues that intermediate scrutiny is warranted for the additional reason that S.B. 1100 only changed the status quo for transgender students. We agree that the passage of S.B. 1100 does not prevent cisgender students from using restrooms, locker rooms, shower rooms, and overnight accommodations that align with their gender identity; it bars only transgender students from using facilities that align with their gender identity. Thus, under our precedent and the precedent of other circuits, S.B. 1100 discriminates on the basis of transgender status as well as on the basis of sex. *See Hecox*, 104 F.4th 1079–80; *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (applying intermediate scrutiny to a policy limiting restroom use to students of a designated sex because the "policy rests on sex-based classifications *and* because transgender people constitute at least a quasi-suspect class"). As we explain below, on the facts of this case we reach the same conclusion regarding the viability of SAGA's equal protection claim, whether the statute is analyzed as a classification based on sex or as a classification based on transgender status.

In applying intermediate scrutiny, we first consider whether the State has identified important governmental interests that the challenged legislation purports to serve. The State carried that burden here. S.B. 1100 identifies the legislature's objectives as "protecting the privacy and safety of all students" specifically "in restrooms and changing facilities where such person[s] might be in a partial or full state of undress in the presence of others." Idaho Code Ann. § 33-6701(7), (2). The statute memorializes the legislature's

judgment that "[r]equiring students to share restrooms and changing facilities with members of the opposite biological sex" undermines the State's privacy and safety objectives and "generates potential embarrassment, shame, and psychological injury." *Id*. § 33-6701(4).  In context, we understand S.B. 1100's use of "privacy" to refer to the State's goal of avoiding situations where students' unclothed bodies are exposed to members of the opposite biological sex.

SAGA does not dispute that protecting bodily privacy is an important governmental objective. *See Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (en banc) (noting our "longstanding recognition that the desire to shield one's unclothed figure from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity" (internal quotation marks and citation omitted and alterations accepted)); *see also Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) (considering a male parole officer's insistence on observing a female parolee's production of a urine sample and explaining that "[t]he right to bodily privacy is fundamental").**[6]**

---

[6] SAGA separately objects to what it characterizes as S.B. 1100's "stated premise" that students have a "natural right to privacy not to be required to share school facilities with members of the opposite biological sex." It argues that this statement is in "direct conflict" with our decision in *Parents for Privacy v. Barr*, which rejected the proposition that the constitutional right to privacy encompasses a right for a cisgender student "not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs."  949 F.3d 1210, 1222 (9th Cir. 2020).  This objection fails because S.B. 1100 does not identify the "natural right to privacy" as a standalone right not to

The district court reasoned that the State's privacy interest is especially important for school-aged children[7] who are still developing mentally, physically, emotionally, and socially, and that "asking them to expose their bodies to students of the opposite sex (or to be exposed to the bodies of the opposite sex) brings heightened levels of stress." *Roe*, 2023 WL 6690596, at *9. Other circuits that have considered and invalidated laws or policies limited to transgender students' use of restrooms agree that protecting student privacy is an important governmental objective. *See, e.g.*, *Grimm*, 972 F.3d at 613 ("No one questions that students have a privacy interest in their body when they go to the bathroom."); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 774–75 (7th Cir. 2023); *Whitaker ex. rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017) (recognizing "that the School District has a legitimate interest in ensuring bathroom privacy rights are protected" and evaluating the challenged policy under intermediate scrutiny), *abrogated on other grounds by Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020). The district court properly

---

share facilities with members of the opposite sex. Rather, the statute states that requiring students to share these facilities with members of the opposite sex causes psychological harm. Idaho Code Ann. § 33-6701(4).

SAGA also contends that the district court "wrongly held that S.B. 1100 could nonetheless be justified by objections to the mere presence of transgender students in facilities matching their gender identity." We read the record differently. The district court did not hold, and Defendants do not argue, that protecting students from "the mere presence of transgender students" is a legitimate government interest that could justify S.B. 1100.

[7] S.B. 1100 applies only to "public schools," which the act defines as "any public school teaching K-12 students within an Idaho school district or charter school." Idaho Code Ann. § 33-6702(2).

concluded, in accordance with our decisions in *Byrd* and *Sepulveda*, that the State's interest in protecting students' bodily privacy is an important objective for purposes of intermediate scrutiny.[8]

Having concluded that the State identified an important governmental objective, our analysis turns to whether the State chose permissible means to achieve that objective, i.e., whether S.B. 1100 is substantially related to the State's objective in protecting student privacy. The district court concluded that S.B. 1100 is substantially related to Idaho's interest in protecting students' privacy because the facilities covered by S.B. 1100 are, "without question, spaces in school (and out of school [in the case of multi-occupancy sleeping quarters]) where bodily exposure is most likely to occur." *Roe*, 2023 WL 6690596, at *9. We acknowledge, as the district court did, that the use of restrooms, locker rooms, shower rooms, and overnight accommodations do not present uniform risks of bodily exposure. *See id.*; *see also Whitaker*, 858 F.3d at 1052 ("Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall."). We do not presume that S.B. 1100's application to each type of facility will be substantially related to the State's objective of protecting student privacy. Rather, the outcome here is dictated by the type of challenge SAGA raises. To prevail on its facial challenge to S.B. 1100, SAGA must show that

---

[8] S.B. 1100 also identifies its purpose as preventing "sexual assault, molestation, rape, voyeurism, and exhibitionism." S.B. 1100, § 33-6701(4). The district court did not decide whether S.B. 1100's means are substantially related to the State's interest in protecting student safety, and we find no evidence in the record supporting that conclusion. Hence, we do not analyze this purported objective further.

S.B. 1100's mandated sex-segregation of all covered facilities is unconstitutional; its equal protection claim fails if S.B. 1100's application to any of the covered facilities survives intermediate scrutiny. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").[9]

In considering the different types of facilities covered by S.B. 1100, it is plain that the privacy interest in avoiding bodily exposure is most strongly implicated in locker rooms and communal shower rooms that lack curtains or stalls. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995) ("Public school locker rooms . . . are not notable for the privacy they afford."). And we see no argument at this stage that S.B. 1100's mandatory segregation of these facilities on the basis of "biological sex" is not substantially related to the State's interests in: (1) not exposing students to the unclothed bodies of students of the opposite sex; and (2) protecting students from having to expose their own unclothed bodies to students of the opposite sex. Because this is a facial challenge, our analysis does not change when considering      S.B. 1100's      discriminatory      effect      on

---

[9] "A paradigmatic as-applied attack, by contrast, challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can 'separate valid from invalid subrules or applications.'" *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (quoting Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L.Rev. 1321, 1334 (2000)). Though SAGA's argument focused on restrooms, its complaint plainly challenged S.B. 1100's application to all covered facilities.

transgender students because excluding all students, including transgender students who have not undergone gender-realignment surgery, from locker rooms and shower rooms designated for students of the opposite "biological sex" is substantially related to the same privacy interest. Accordingly, whether viewed as classifying students based on their sex or based on their transgender status, we conclude that S.B. 1100 is not facially unconstitutional under the Equal Protection Clause.

SAGA's arguments to the contrary are unpersuasive. SAGA first argues that Defendants have not met their heightened burden because they "introduced no evidence— not a single document or witness—that substantiated their privacy and safety defenses."  SAGA overlooks that this is an unusual situation in which the State's privacy justification is easily corroborated by common experience and circuit precedent.  "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000).  That some students in a state of partial undress may experience "embarrassment, shame, and psychological injury" in the presence of students of a different sex is neither novel nor implausible.  *See* Idaho Code Ann. § 33-6701(4); *Virginia*, 518 U.S. at 550 n.19 (noting that admitting women to Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements").

SAGA's contentions that "S.B. 1100 is a solution in search of a problem" and that the absence of past harms "is akin to a smoking gun against Defendants' factual defense" are similarly unavailing.  A harm need not have occurred

before a legislature can act; nor is it our role to decide whether the legislative action is substantively good policy. Our task is limited to deciding whether S.B. 1100 is "substantially related" to the State's interest in protecting students' privacy; we do not evaluate whether S.B. 1100 is the most effective means of furthering that objective. *See Nguyen*, 533 U.S. at 70 ("None of our gender-based classification equal protection cases have required that the [policy] under consideration must be capable of achieving its ultimate objective in every instance."); *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1132 (9th Cir. 1982) ("[T]he existence of wiser alternatives than the one chosen does not serve to invalidate the policy here since it is substantially related to the goal.").

Finally, SAGA argues that Defendants have not met their burden under heightened scrutiny of proving "why less intrusive means . . . cannot substantially achieve" Idaho's objective in safeguarding students' privacy. Intermediate scrutiny in the equal protection context requires only that the means are substantially related to the government's objective, not the least restrictive means or the means most narrowly tailored to achieve the government's interest. *See Nguyen*, 533 U.S. at 70; *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018). Thus, though SAGA suggests reasonable measures that could accommodate the State's privacy concern, including commonsense alternatives like installing privacy partitions in changing facilities, SAGA does not explain why the Equal Protection Clause imposes an obligation on the State to adopt them as an alternative to S.B. 1100. *See Clark*, 695 F.2d at 1131 ("The existence of these alternatives shows only that the exclusion . . . is not *necessary* to achieve the desired goal. It does not mean that the required substantial relationship does not exist."

(footnote omitted)).  The statute's means are substantially related to the governmental interest in protecting students' privacy in these facilities.

Given the facial nature of SAGA's challenge to S.B. 1100, we agree with the district court that SAGA did not satisfy its burden of showing that it was likely to succeed on the merits of its equal protection claim.

## B.  Title IX

SAGA contends that S.B. 1100 violates Title IX of the Education Amendments of 1972, 86 Stat. 373, 20 U.S.C. § 1681 *et seq.*, because discrimination on the basis of transgender status is a form of sex-based discrimination prohibited by Title IX, and S.B. 1100 discriminates against transgender students by barring them from using sex-separated facilities that align with their gender identity.

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Another provision, § 1686, carves out "living facilities" from Title IX's general antidiscrimination mandate:  "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  20 U.S.C. § 1686.  A Department of Education regulation, 34 C.F.R. § 106.33, states: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R.

§ 106.33.  *See also* 34 C.F.R. § 106.32(b) (stating that "[a] recipient may provide separate housing on the basis of sex" but requiring separate housing to be comparable in quality and cost.).

"To [prevail on] a Title IX claim, a plaintiff must [establish] that: (1) the defendant educational institutional receives federal funding; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity, and (3) the latter occurred on the basis of sex."  *See Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020).

In *Parents for Privacy*, we considered a challenge to a high school's policy of allowing transgender students to use restrooms, locker rooms, and showers that aligned with their gender identity rather than their sex assigned at birth, 949 F.3d 1210, 1227 (9th Cir. 2020).  We concluded that Title IX allows states to maintain sex-segregated facilitates.  More specifically, we observed that § 1686 allows educational institutions to "maintain[] separate living facilities for the different sexes," and that § 106.33 authorizes states to provide sex-segregated "toilet, locker room, and shower facilities on the basis of sex."  *Id.* (citing 20 U.S.C. § 1686 and 34 C.F.R. § 106.33).  We also recognized that "just because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity."  *Id.*

As noted, SAGA does not challenge the Defendants' authority to maintain the sex-segregated facilities at issue; rather, it argues that the State impermissibly discriminates by requiring transgender students to use facilities that do not align with their gender identity.  *See A.C.*, 75 F.4th at 770

("The question is different: who counts as a 'boy' for the boys' rooms, and who counts as a 'girl' for the girls' rooms—essentially, how do we sort by gender?").

So framed, the parties' dispute narrows to a disagreement regarding the definition of "sex" as used in Title IX. Neither Title IX nor its implementing regulations defines the term. SAGA argues on appeal that the word "sex" must be construed in light of the statutory context as a whole, including § 1681's broad prohibition on sex discrimination.[10]   SAGA contends that excluding transgender students from facilities corresponding to their gender identity meets Title IX's definition of discrimination because it constitutes differential treatment and causes injury. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (defining 'discriminate against' as referring to 'distinctions or differences in treatment that injure protected individuals.'). Thus, SAGA asserts that reading § 1686 and § 106.33 to authorize the exclusion of transgender students from facilities matching their gender identity runs headlong into § 1681's prohibition on sex-based discrimination.

Defendants argued in the district court and on appeal that SAGA's Title IX claim fails because, "sex" as used in Title IX, refers to sex assigned at birth and § 1686, together with § 106.33, authorizes schools to maintain sex-separated facilities. In this view, because Title IX authorizes schools to segregate the facilities regulated by S.B. 1100 on the basis of "biological sex" or sex assigned at birth, excluding transgender students from facilities corresponding to their

---

[10] SAGA largely developed this argument on appeal; the Title IX argument in its motion for a preliminary injunction spanned only two paragraphs.

gender identity cannot violate Title IX's prohibition on sex discrimination.  The district court agreed with Defendants.  In doing so, the court relied heavily on *Adams v. Sch. Bd. of St. Johns County,* 57 F.4th 791 (11th Cir. 2022) (en banc).  We conclude that the district court did not abuse its discretion by ruling that SAGA did not show a likelihood of success on this claim, but our reasoning differs from the district court's and we do not reach the question whether "sex" as used in Title IX authorizes schools to limit students' use of the facilities regulated by S.B. 1100 on the basis of sex assigned at birth.

Circuit precedent establishes that discrimination on the basis of transgender status is a form of sex-based discrimination.  *Hecox*, 104 F.4th at 1079.  In *Bostock v. Clayton County, Georgia*, the Supreme Court held that firing a worker based on the worker's transgender status constitutes unlawful sex discrimination under Title VII because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  590 U.S. 644, 660 (2020).  We applied *Bostock*'s reasoning to Title IX's protections against discrimination on the basis of gender in *Doe v. Snyder*.  28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII.").  And we subsequently held in *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023), that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX."

Though we have extended *Bostock*'s reasoning to Title IX, *Bostock* did "not purport to address bathrooms, locker rooms, or anything else of the kind," 590 U.S. at 681, and it did not consider whether Title IX or its implementing regulations put states on notice that policies restricting

access to these types of facilities on the basis of gender assigned at birth may constitute unlawful discrimination against transgender persons.

SAGA argues on appeal that Title IX's general prohibition of sex-based discrimination provided notice to defendants that S.B. 1100 unlawfully discriminates on the basis of sex because, viewed in the context of the entire statute, the term "sex" cannot be limited to sex assigned at birth. The Supreme Court in *Bostock* neither adopted nor rejected this argument in the context of Title VII. Consistent with the parties' stipulation, the Court "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female." 590 U.S. at 655.

Other circuits have disagreed over whether Title IX's use of the word "sex" unambiguously refers to sex assigned at birth. The Eleventh Circuit concluded in *Adams* that the word "sex," as used in Title IX, unambiguously refers to reproductive function—what S.B. 1100 refers to as "biological sex." 57 F.4th at 812. But the Fourth and Seventh Circuits have rejected the proposition that "sex" refers only to reproductive functions or sex assigned at birth. *See A.C.*, 75 F.4th at 770; *id.* at 775 (Easterbrook, J. concurring) ("[S]ex is such a complex subject that any invocation of plain meaning is apt to misfire."); *see also Grimm*, 972 F.3d at 618. We have never addressed this question directly, and we need not reach it here because Defendants alternatively argue that, "[w]hatever else may be true, Title IX does not 'so clearly' prohibit designating intimate spaces by biology that states could 'fairly . . . make an informed choice' before accepting federal funds." *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Because we agree that SAGA did not make this

showing, we conclude that the district court did not err by denying preliminary injunctive relief on this claim.

Title IX funding is distributed to the states pursuant to the Spending Clause of the Constitution. *See* U.S. Const. art. I, § 8, cl. 1; *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause."). "Congress has broad power to set the terms on which it disburses federal money to the States, but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citations omitted) (quoting *Pennhurst*, 451 U.S. at 17).

Because legislation enacted pursuant to the spending power is in the nature of a contract, recipients of federal funds must accept federally imposed conditions on funds voluntarily and knowingly. *Id.* "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). As the Supreme Court has explained:

> The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of

federal    moneys,    it    must    do    so
unambiguously.

*Pennhurst*, 451 U.S. at 17 (citations omitted).  A funding
recipient must have clear notice of "what rules it must
follow[.]"  *Cummings v. Premier Rehab Keller, P.L.L.C.,*
596 U.S. 212, 220 (2022).  Examples include *Pennhurst*, 451
U.S. at 25, where the Court held that the recipient lacked
notice that by accepting federal grant funds it agreed to
provide costly treatment to the state's intellectually disabled
citizens, and *Davis*, 526 U.S. at 649, where the Court
concluded that the recipient received adequate notice that
Title IX proscribes student-on-student sexual harassment.

Applying the clear-notice rule here, we agree with the
State that SAGA failed to establish that Defendants had
adequate notice, when they accepted federal funding, that
Title IX prohibits the exclusion of transgender students from
restrooms, locker rooms, shower facilities, and overnight
lodging corresponding to their gender identity.  We
recognize that "Congress need not 'specifically identify and
proscribe' each condition" in Spending Clause legislation.
*Davis*, 526 U.S. at 650 (alterations accepted) (quoting
*Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 666
(1985)).  But from the time of the enactment of Title IX and
its implementing regulations, the scheme has authorized
schools   to   maintain   sex-segregated   facilities,   and
contemporary dictionary definitions commonly defined
"sex" in terms that refer to students' sex assigned at birth.
Thus, this is an instance in which liability does not arise
under Title IX unless the challenged conditions were set out

"unambiguously." *Arlington Cent. Sch. Dist.*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17).[11]

SAGA's arguments to the contrary are not persuasive. SAGA first contends the Spending Clause's clear-notice rule affects only the availability of retrospective relief—money damages—and does not affect the availability of the injunctive relief SAGA seeks. This argument overlooks that the Supreme Court applied the clear-notice rule in *Pennhurst*, 451 U.S. at 17–18, 24–25, a case involving injunctive relief, *see id.* at 8–9. Because SAGA cites no affirmative authority supporting its contention that the clear notice rule limits only the availability of money damages, SAGA fails to persuade that the district court made an error of law.[12]

---

[11] We emphasize that this is an unusual instance in which the statute in question appears to affirmatively authorize conduct the funding recipient has engaged in, not merely a case in which the scope of conduct proscribed by the statute is uncertain. We agree with the Eleventh Circuit that "once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper." *Sandoval v. Hagan*, 197 F.3d 484, 495 (11th Cir. 1999) (citing *Bennett*, 470 U.S. at 666–69, for the proposition that "federal grant programs cannot prospectively resolve every possible 'ambiguity' concerning particular applications of their statutory requirements"), *reversed on other grounds*, *Alexander v. Sandoval*, 532 U.S. 275 (2001).

[12] The Supreme Court has commonly "applied th[is] contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages." *Cummings*, 596 U.S. at 219 (alteration in original) (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). But we read Supreme Court precedent as holding that the clear notice rule applies to other remedies as well. *See Barnes*, 536 U.S.

SAGA also argues that Title IX's implementing regulations, specifically, 34 C.F.R. § 106.33,[13] cannot reasonably be construed to create a vast loophole in Title IX's nondiscrimination mandate, and more specifically argues that an implementing regulation cannot be read to authorize conduct prohibited by a statute—in this case, the antidiscrimination mandate found in § 1681.

We do not see a contradiction between Title IX and § 106.33. Notably, § 106.33 implements § 1681 rather than the carve-out in § 1686.   *See* 34 C.F.R. §§ 106.33.[14] Section 106.33, entitled "Comparable facilities," requires that, if a recipient of federal funding provides separate toilet, locker room, and shower facilities on the basis of sex, the facilities must be comparable.  In this way, § 106.33 extends § 1681's protections against sex-based discrimination rather than expanding the scope of § 1686's carve out.   The regulation works in tandem with § 1681's antidiscrimination

---

at 187 ("[A] remedy is 'appropriate relief,' only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature.  A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." (citation omitted) (quoting *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 73 (1992))); *see also Cummings*, 596 U.S. at 220. We know of no authority limiting Title IX remedies to damages.

[13] SAGA also points to 34 C.F.R. § 106.32(b) ("A recipient may provide separate housing on the basis of sex."), but this regulation is not the focus of its argument.

[14] When adopting the original Title IX regulations in 1975, the Department of Health, Education, and Welfare cited § 1681, but not § 1686, as statutory authority for § 106.33.  *See* 40 Fed. Reg. 24137, 24141 (June 4, 1975).   The Department of Education retained that authority when adopting its own regulations in 1980.  *See* 45 Fed. Reg. 30955, 30960 (May 9, 1980).

mandate, requiring that equivalent facilities must be provided where funding recipients choose to maintain sex-segregated facilities.  Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686's carve-out of living facilities from Title IX's general mandate is unambiguously limited to facilities such as dormitories.[15]

Given the clear notice rule and the extent to which the parties developed this issue, SAGA failed to meet its burden to show that the State had clear notice at the time it accepted federal funding that Title IX prohibits segregated access to the facilities covered by S.B. 1100 on the basis of transgender status.[16]

---

[15] The doctrine of *expressio unius est exclusio alterius* "as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (quoting *Boudette v. Barnette*, 923 F.2d 754, 756–57 (9th Cir. 1991)).  But this canon "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (internal quotation marks and citation omitted and alterations accepted).  The absence of an express reference to restrooms, locker rooms, and shower rooms in § 1686 much more likely reflects the fact that in 1972 the separation of these facilities on the basis of sex was so assumed that it did not merit special mention in the text of the statute.

[16] The Department of Education published regulations, effective August 1, 2024, that endorse SAGA's interpretation of Title IX.  *See* 34 C.F.R. § 106.31(a)(2) (prohibiting a school from separating on the basis of sex when doing so prevents "a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex").  This regulation postdates the enactment of SB 1100.  On January 29, 2025,

## C.  Right to Informational Privacy

The Supreme Court has recognized two types of interests protected by the right of privacy: "the individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977). The former interest, often referred to as the right to "informational privacy," "applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789–90 (9th Cir. 2002).

SAGA argues that by "excluding transgender students from facilities matching their gender identity, S.B. 1100 exposes their transgender status to others in violation of their constitutional right to privacy." We have not yet addressed

---

President Trump issued Executive Order 14190, which defined gender based on sex assigned at birth. Exec. Order No. 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025). Executive Order 14190 instructed the Secretary of Education to recommend a plan to eliminate federal funding for schools that support transgender students' social transition, including policies that allow for access to bathrooms corresponding to their gender identity. *Id.* Relatedly, on January 20, 2025, President Trump announced Executive Order 14148, 90 Fed. Reg. 8237 (Jan. 28, 2025), which revoked Executive Order 13988, 86 Fed. Reg. 7023 (Jan. 25, 2021), announced under President Biden. *Id.* Regardless of the viability of the Department of Education's August 2024 regulations, they do not alter the conclusion we reach on the question presented by this appeal. We express no opinion about whether the Department of Education's August 2024 regulation or President Trump's executive orders provide prospective notice that excluding transgender students from the type of facilities covered by S.B. 1100 that align with their gender identity violates Title IX.

whether an individual's transgender status is the type of information protected by this right, but assuming that it is, we conclude that SAGA did not show that it will likely succeed on this claim.

S.B. 1100 requires transgender students to use either the facility designated for persons of their "biological sex" or a unisex single-occupancy facility. *See* Idaho Code Ann. § 33-6704(1)–(3). The statute does not require or permit Defendants to disclose any information about a student's transgender status to a third party. *Cf. Powell v. Schriver*, 175 F.3d 107, 111–12 (2d Cir. 1999) (finding a violation of the right to informational privacy where a corrections officer told another officer about the plaintiff's transsexual status in the presence of other inmates and staff members). SAGA may be correct that transgender students' use of single-occupancy facilities will invite unwanted attention from their peers. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) (observing that requiring transgender students to use single-user facilities "would very publicly brand all transgender students with a scarlet 'T'" (citing *Whitaker*, 858 F.3d at 1045)). But S.B. 1100 requires schools to provide an accommodation to a student who for "*any* reason, is unwilling or unable to use a multi-occupancy restroom or changing facility designated for the person's sex." Idaho Code Ann. § 33-6705(1)(a) (emphasis added). Because the statute does not limit the use of single-occupancy facilities to only transgender students, we cannot say on the existing record that observing a student accessing such a facility will necessarily disclose that student's transgender status. We do not preclude the possibility that SAGA may be able to show otherwise after the factual record is more fully developed; at this stage, we merely decide that the district court did not err by denying

preliminary injunctive relief on the record currently available.

The facts of this case are distinguishable from those in which the government forces individuals to provide information that unambiguously discloses their transgender status.   In the cases SAGA cites, the state prevented transgender individuals from reflecting their gender identity on official documents, thereby requiring them to reveal their sex recorded at birth every time they displayed their identification document to another person.  *See Ray v. McCloud*, 507 F. Supp. 3d 925, 929, 933 (S.D. Ohio 2020) (birth certificates); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (birth certificates); *Love v. Johnson*, 146 F. Supp. 3d 848, 852 (E.D. Mich. 2015) (driver's licenses and state identification documents). The district court did not err by concluding that SAGA failed to show it was likely to succeed on the merits of this claim.

## IV.    CONCLUSION

SAGA has not raised "serious questions going to the merits" of its facial challenge, so we do not consider the remaining *Winter* factors.  *Disney Enters.*, 869 F.3d at 856. The district court did not abuse its discretion by denying SAGA's motion for a preliminary injunction.

**AFFIRMED.**